[No. C002364. Third Dist. July 20, 1989.]

AFL-CIO et al., Plaintiffs and Respondents, v. GEORGE DEUKMEJIAN, as Governor, etc., Defendant and Appellant.

428

**COUNSEL**

Vance W. Raye, Robert D. Tousignant and Peter A. Baldridge for Defendant and Appellant.

Vaughn R. Walker, Michele B. Corash, Kevin M. Fong, Michael J. Steel and Pillsbury, Madison & Sutro as Amici Curiae on behalf of Defendant and Appellant.

Albert H. Meyerhoff, David B. Roe, Stephen P. Berzon, Gay C. Danforth, Altshuler & Berzon, Laurence Gold and Ralph Santiago Abascal for Plaintiffs and Respondents.

**OPINION**

**PUGLIA, P. J.**—This appeal arises out of Proposition 65, an initiative adopted at the November 1986 General Election. The initiative, designed to protect the people and their water supply from harmful chemicals, added sections 25249.5—25249.13 to the Health and Safety Code (hereafter all statutory references to sections of an unspecified code are to this code). Section 25249.8, subdivision (a) requires the Governor, on or before March 1, 1987, to publish a list of "chemicals known to the state to cause cancer or reproductive toxicity." The list must include "at a minimum" those substances identified by reference in Labor Code section 6382, subdivisions (b)(1) and (d). The issue in this case involves the required content of that list.

Pursuant to subdivision (a) of section 25249.8, Governor Deukmejian caused to be published a list of chemicals. The list consisted of 26 known *human* carcinogens and 3 known *human* reproductive toxins identified by reference in Labor Code section 6382, subdivisions (b)(1) and (d). Thereafter, plaintiffs, a group of taxpayers concerned with the environment, filed in superior court their petition for writ of mandate and complaint for injunctive relief (complaint). In count one of their complaint plaintiffs sought to compel the Governor (defendant) to include on the list not only known *human* but also known *animal* carcinogens and reproductive toxins referred to in Labor Code section 6382, subdivisions (b)(1) and (d). Plaintiffs alleged defendant had a ministerial duty to place these chemicals, over 200 in all, on the list required by section 25249.8, subdivision (a) to be published "on or before March 1, 1987" (hereafter initial list).

Defendant demurred to the complaint, claiming it failed to state facts sufficient to constitute a cause of action, specifically, that neither mandamus

nor injunction lay to compel the exercise of discretion in a certain manner, and furthermore that Proposition 65 requires only known *human* carcinogens and reproductive toxins to be listed.

The trial court overruled the démurrer and in response to plaintiffs' motion for preliminary injunctive relief on count one of the complaint, issued a preliminary injunction enjoining defendant from failing forthwith to publish a list of substances that includes, at minimum, the known human *and animal* carcinogens identified by reference in Labor Code section 6382, subdivisions (b)(1) and (d). Defendant appeals. We shall affirm.[1]

■ " '[T]he initiative is in essence *a legislative battering ram* which may be used to tear through the exasperating tangle of the traditional legislative procedure and strike directly toward the desired end. Virtually every type of interest-group has on occasion used this instrument. It is deficient as a means of legislation in that it permits very little balancing of interests or compromise, but it was designed primarily for use in situations where the ordinary machinery of legislation had utterly failed in this respect. . . .' [Citation.]" (Italics in original; *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 228 [149 Cal.Rptr. 239, 583 P.2d 1281].)

Whether Proposition 65 may aptly be described as "a legislative battering ram," it does "strike directly toward the desired end." (22 Cal.3d at p. 228.) The initiative, entitled the "Safe Drinking Water and Toxic Enforcement Act of 1986" (hereinafter Act or Proposition 65), imposes severe penalties upon those who contaminate drinking water with carcinogenic and toxic chemicals and who expose individuals to such chemicals without warning. Section 1 of the preamble of the Act recites: "The people of California find that hazardous chemicals pose a serious potential threat to their health and well-being, that state government agencies have failed to provide them with adequate protection, and that these failures have been serious enough to lead to investigations by federal agencies of the administration of California's toxic protection programs. . . ."

To deal with the potential threat from hazardous chemicals, the Act declares the rights of the people:

---

[1] Plaintiffs' complaint contains two counts. Count two seeks to compel the Governor also to list forthwith substances that "an agency of the state or federal government has formally required . . . to be labeled or identified as causing cancer or reproductive toxicity" as mandated by the last clause of subdivision (b) of section 25249.8. The preliminary injunction does not apply to the relief sought in count two and that count is not involved in this appeal. Defendant's demurrer challenged the sufficiency of both counts one and two. Defendant purports to appeal from the "Order Granting Preliminary Injunction and Overruling Demurrer." We shall dismiss the purported appeal from the order overruling the demurrer. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 82, pp. 104-105.)

"(a) To protect themselves and the water they drink against the chemicals that cause cancer, birth defects, or other reproductive harm.

"(b) To be informed about exposures to chemicals that cause cancer, birth defects, or other reproductive harm.

"(c) To secure strict enforcement of the laws controlling hazardous chemicals and deter actions that threaten public health and safety.

"(d) To shift the cost of hazardous waste cleanups more onto offenders and less onto law-abiding taxpayers."

There are two major operative provisions in Proposition 65. The first prohibits any person in the course of doing business from knowingly discharging or releasing to a source of drinking water any chemical known to the state to cause cancer or reproductive toxicity. (§ 25249.5.) This prohibition becomes effective 20 months after the chemical has been identified and listed as one known to the state to cause cancer or reproductive toxicity. (§ 25249.9, subd. (a).) The second major operative provision prohibits any person in the course of doing business from knowingly and intentionally exposing, without prior clear and reasonable warning, any individual to any chemical known to the state to cause cancer or reproductive toxicity. (§ 25249.6.) This prohibition becomes effective 12 months after the chemical has been identified and listed as one known to the state to cause cancer or reproductive toxicity. (§ 25249.10, subd. (b).) Violators of either provision are subject to civil penalties of $2,500 per day for each violation. (§ 25249.7, subd. (b).)

The Act applies only to those chemicals that have been identified and listed as chemicals "known to the state to cause cancer or reproductive toxicity." (§ 25249.5.) The identification and listing of such chemicals are pivotal to the entire statutory scheme. Section 25249.8, which provides the mechanism for determining the contents of that list, is at the center of this dispute. We quote section 25249.8 in relevant part:

"(a) On or before March 1, 1987, the Governor shall cause to be published a list of those chemicals known to the state to cause cancer or reproductive toxicity within the meaning of this chapter, and he shall cause such list to be revised and republished in light of additional knowledge at least once per year thereafter. Such list shall include at a minimum those substances identified by reference in Labor Code Section 6382(b)(1) and those substances identified additionally by reference in Labor Code Section 6382(d).

"(b) A chemical is known to the state to cause cancer or reproductive toxicity within the meaning of this chapter if in the opinion of the state's

qualified experts it has been clearly shown through scientifically valid testing according to generally accepted principles to cause cancer or reproductive toxicity, or if a body considered to be authoritative by such experts has formally identified it as causing cancer or reproductive toxicity, or if an agency of the state or federal government has formally required it to be labeled or identified as causing cancer or reproductive toxicity.

"(c) On or before January 1, 1989, and at least once per year thereafter, the Governor shall cause to be published a separate list of those chemicals that at the time of publication are required by state or federal law to have been tested for potential to cause cancer or reproductive toxicity but that the state's qualified experts have not found to have been adequately tested as required.

"(d) The Governor shall identify and consult with the state's qualified experts as necessary to carry out his duties under this section."

Defendant issued the initial list pursuant to section 25249.8, subdivision (a) on February 27, 1987. As we have noted, it consisted of 26 chemicals known to cause cancer in humans and 3 chemicals known to cause reproductive toxicity in humans. At the same time, defendant issued a candidate list of "probable" human carcinogens identified by reference in Labor Code section 6382, subdivisions (b)(1) and (d). According to a public statement issued concurrently by the Secretary of the State Health and Welfare Agency, the lead agency designated to implement the provisions of the Act (§ 25249.12), "This total of 29 chemicals [on the initial list] represents ALL the known human carcinogens listed by the World Health Organization's International Agency for Research on Cancer (IARC) and the U.S. Public Health Service's National Toxicology Program (NTP). It also includes ALL known human reproductive toxicants as listed by the U.S. Department of Labor's Occupational Safety and Health Administration (OSHA)." (Emphasis in original.)

In his public statement the Secretary also announced the formation of the Safe Drinking Water and Toxic Enforcement Act Scientific Advisory Panel (Panel) to assist the Governor in carrying out his responsiblities under the Act in "consult[ation] with the state's qualified experts as necessary . . . ." (§ 25249.8, subd. (d).) The Governor submitted the candidate list of probable human carcinogens to the Panel for review and evaluation whether any of these chemicals should be added to the initial list of chemicals known to the state to cause cancer or reproductive toxicity.

The trial court ruled defendant's initial list was deficient in that it included only known *human* carcinogens and reproductive toxins, omitting a

substantial number of known *animal* carcinogens and reproductive toxins identified by reference in Labor Code section 6382, subdivisions (b)(1) and (d).

The content of the initial list is governed by section 25249.8, subdivision (a), the interpretation of which is disputed by the parties. ■ In ascertaining the meaning of a statute, we look first to the language in which it is framed. (*Leroy T.* v. *Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 434, 438 [115 Cal.Rptr. 761, 525 P.2d 665].) If the language is clear, the statute must be enforced according to its terms. (*Ibid.*) ■ We shall conclude the language of section 25249.8 clearly requires both known human and known animal carcinogens and reproductive toxins identified by reference in Labor Code section 6382, subdivisions (b)(1) and (d) to be included on the initial list.

Subdivision (a) of section 25249.8 specifies that the initial list include "at a minimum" those chemicals identified by reference in Labor Code section 6382, subdivisions (b)(1) and (d). Labor Code section 6382 is a part of the California Occupational Safety and Health Act of 1973. (Lab. Code, § 6300 et seq.) It requires the Director of Industrial Relations to prepare and maintain a list of substances potentially hazardous to human health and specifies various categories of substances for inclusion therein.[2] The list shall be made available to manufacturers, employers and the public. (Lab. Code, § 6380.)

Labor Code section 6382 refers in subdivision (b)(1) to "Substances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." The IARC is a scientific research organization affiliated with the United Nations World Health Organization. IARC performs peer reviews of published reports on experimental or epidemiological

[2] Labor Code section 6382 provides in relevant part: "The director shall prepare and amend the list of hazardous substances according to the following procedure: [¶] (a) Any substance designated in any of the following listings in subdivision (b) shall be presumed by the director to be potentially hazardous and shall be included on the list; provided, that the director shall not list a substance or form of the substance from the listings in subdivision (b) if he or she finds, upon a showing pursuant to the procedures set forth in Section 6380, that the substance as present occupationally is not potentially hazardous to human health; and provided further, that a substance, mixture, or product shall not be considered hazardous to the extent that the hazardous substance present is in a physical state, volume, or concentration for which there is no valid and substantial evidence that any adverse acute or chronic risk to human health may occur from exposure. [¶] (b) The listings referred to in subdivision (a) are as follows: [¶] (1) Substances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC). . . . [¶] (d) Notwithstanding Section 6381, in addition to those substances on the director's list of hazardous substances, any substance within the scope of the federal Hazard Communication Standard (29 C.F.R. Sec. 1910.1200) is a hazardous substance subject to this chapter."

studies and on chemicals and industrial processes. The results of these peer reviews are published in monographs identifying substances as carcinogens. IARC's listings distinguish substances according to evidence of known carcinogenicity. The IARC Group 1 category includes those chemicals for which there is "sufficient evidence" from epidemiological studies to support a causal association between exposure to the chemical and cancer or reproductive toxicity in humans. The parties agree these are the human carcinogens referred to in Labor Code section 6382, subdivision (b)(1) in the phrase "human or animal carcinogens." These known human carcinogens were included in the initial list published by defendant.[3]

The IARC publishes a supplemental list or category of chemicals for which there is "sufficient evidence" of carcinogenicity in animals. Many of these supplemental category chemicals are also included in the IARC Group 2 category, which includes those chemicals for which IARC has concluded there is either "sufficient evidence" of causing cancer or reproductive toxicity in animals or "limited evidence" of carcinogenicity in humans, and which IARC concludes are "probably" carcinogenic to humans. As the IARC report states: "[The Group 2] category includes exposures for which, at one extreme, the evidence of human carcinogenicity is almost 'sufficient,' as well as exposures for which, at the other extreme, it is inadequate. To reflect this range, the category was divided into higher (*Group A*) and lower (*Group B*) degrees of evidence. Usually, category 2A was reserved for exposures for which there was at least *limited evidence* of carcinogenicity to humans. The data from studies in experimental animals played an important role in assigning studies to category 2, and particularly those in Group B; thus, the combination of *sufficient evidence* in animals and inadequate in humans usually resulted in a classification of 2B." (Italics in original.)

These Group 2 and supplemental category chemicals were omitted from the initial list published by defendant, and instead were submitted to the Panel for review and consideration whether they should be added to the list. The trial court ordered the Group 2 and supplemental category chemicals included in the initial list because they are within the IARC scope of chemicals for which there exists sufficient evidence of carcinogenicity in animals, or because they come within the scope of the federal Hazard Communication Standard. (See 29 C.F.R. § 1910.1200, appen. A.)

---

[3] The IARC report expressly concludes that there is "sufficient evidence" of a causal relationship between exposure to these chemicals and cancer or reproductive toxicity in humans. The words "known carcinogen" are not used by the IARC. Nonetheless, both sides agree that for the purpose of interpreting the IARC monographs, "sufficient evidence" of carcinogenicity is the equivalent of "known" carcinogenicity.

Labor Code section 6382, subdivision (d), refers to ". . . any substance within the scope of the federal Hazard Communication Standard [HCS] (29 C.F.R. Sec. 1910.1200) . . . ." The HCS includes as carcinogens all chemicals listed by the IARC as carcinogens or potential carcinogens, as well as substances identified as known or probable carcinogens in the *Annual Report on Carcinogens* published by the National Toxicology Program (NTP) and certain additional substances regulated as carcinogens pursuant to the federal Occupational Safety and Health Act (OSHA). (29 C.F.R. 1910.1200, appens. A, B.)

The Act is intended to protect people and the water they drink. Given that purpose, defendant argues that a chemical that is not a known *human* carcinogen or reproductive toxin is not subject to the operative provisions of the Act and therefore need not be included on the initial or subsequent lists.

The argument necessarily assumes that "chemicals known to the state to cause cancer or reproductive toxicity" (§ 25249.5) refers only to those "known to the state to cause cancer or reproductive toxicity *in humans*." (Italics added.) No such limitation is expressed in the Act. Although the Act clearly was intended to protect people and not household pets or livestock, the suggestion that only known human carcinogens are subject to the Act ignores the plain language of section 25249.8, subdivision (a), which mandates the initial list include, "at a minimum," those chemicals identified by reference in Labor Code section 6382, subdivision (b)(1) and subdivision (d). Subdivision (b)(1) refers expressly both to human and animal carcinogens and subdivision (d) incorporates the HCS which includes known animal carcinogens.

█ A statute "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . ." (Fns. omitted; 2A Sutherland, Statutory Construction (4th ed. 1984) § 46.06, p. 104.) A construction that would exclude known animal carcinogens from the scope of the Act would render the second sentence of section 25249.8, subdivision (a) nugatory in so far as it specifies the minimum content of the initial list. █ To give meaning to both sentences of subdivision (a), we are impelled to conclude the initial list must include at a minimum those known human and animal carcinogens identified by reference in the specified subdivisions of section 6382 of the Labor Code.

Defendant refers to the official ballot argument by the proponents of the Act, which states in part: "Proposition 65's new civil offenses focus only on chemicals that are *known to the state* to cause cancer or reproductive disorders. Chemicals that are only suspect are not included." (Italics in original.) Defendant notes the Group 2 and supplemental categories included in the

IARC lists are composed of chemicals that are only *suspected* of causing cancer or reproductive disorders in humans. Because the Act was designed to include only those chemicals *known* to cause cancer, defendant argues *suspected* human carcinogens need not be included in the initial list.

■ The courts often turn to the ballot summaries and arguments for the purpose of determining "the voters' intent and understanding of a ballot measure." (*Legislature* v. *Deukmejian* (1983) 34 Cal.3d 658, 673, fn. 14 [194 Cal.Rptr. 781, 669 P.2d 17]; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at pp. 245-246.)[4] Placed in its relevant context, the portion of the proponents' ballot argument cited by defendant does not support defendant's position. The cited portion of the ballot argument states: "Proposition 65's new civil offenses focus only on chemicals that are *known to the state* to cause cancer or reproductive disorders. Chemicals that are only suspect are not included. The Governor must list these chemicals, after full consultation with the state's qualified experts." (Italics in original.) The ballot argument then continues: "*At a minimum,* the Governor must include the chemicals *already listed as known carcinogens* by two organizations of the most highly regarded national and international scientists: the U.S.'s National Toxicology Program and the U.N.'s International Agency for Research on Cancer." (Italics added.)

■ Thus the proponent's ballot argument squares completely with the provisions of section 25249.8, subdivisions (a) and (b); nothing there suggests the Act is limited to those chemicals known to cause cancer only in humans. Rather, the list must include at a minimum those chemicals already known to cause cancer and already listed by "highly regarded national and international scientists." These lists include substances known to cause cancer in humans or animals, and it is these lists which are identified by reference in Labor Code section 6382, subdivisions (b)(1) and (d), and incorporated into the Act by way of section 25249.8, subdivision (a).

■ The trial court found, and we agree, that only those chemicals that are known, and not merely suspected, of causing cancer or reproductive

---

[4] Over defense objection, the trial court granted plaintiffs' request to take judicial notice of, inter alia, various preelection materials (newspaper articles and editorials, committee reports, interest-group articles, etc.), including materials distributed by both proponents and opponents of the initiative, most of which concluded that if Proposition 65 passed, the initial list required of defendant would have to include known human and animal carcinogens.

On appeal, defendant again takes issue with the judicial notice of these materials. While the courts have on occasion resorted to such extrinsic materials as an aid in interpreting ambiguous language in statutes or initiative measures (e.g., *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 144, fn. 12 [197 Cal.Rptr. 79, 672 P.2d 862]; *People* v. *Tanner* (1979) 24 Cal.3d 514, 520, fn. 4 [156 Cal.Rptr. 450, 596 P.2d 328]; *Goodman* v. *County of Riverside* (1983) 140 Cal.App.3d 900, 906, 907-908, and fns. 3-5 [190 Cal.Rptr. 7]), we have no need to do so, as the Act and the ballot arguments provide the dispositive interpretive information.

toxicity must be on the list. The IARC Group 1 substances, made up of chemicals for which there is sufficient evidence of carcinogenicity to humans, clearly are subject to the Act and were included in defendant's initial list. Beyond that, the question is not whether a chemical is "probably" carcinogenic to humans, but whether it is in fact a known carcinogen or reproductive toxin. IARC Group 2 and supplemental category chemicals as to which there is sufficient evidence that exposure causes cancer or reproductive toxicity in animals are also known carcinogens. Just as "sufficient evidence" (fn. 3, *ante*) with regard to Group 1 chemicals means "known carcinogenicity," so also it means "known carcinogenicity" in respect to Group 2 and supplemental category chemicals which must therefore be included in the initial list.

■ The same analysis requires the initial list to include those carcinogens within the scope of the HCS. (Lab. Code, § 6382, subd. (d).) As noted, the HCS includes, inter alia, substances included in the *Annual Report on Carcinogens* published by the NTP. (29 C.F.R. § 1910.1200, appen. A.) Like the IARC, the NTP divides carcinogens into categories: "known" carcinogens and those chemicals "reasonably anticipated" to be carcinogens. The NTP report states: "For the purpose of this Report, 'known carcinogens' are defined as those substances for which the evidence from human studies indicates that there is a causal relationship between exposure to the substance and human cancer. *Substances 'which may reasonably be anticipated to be carcinogens' are defined as those for which there is a limited evidence of carcinogenicity in humans or sufficient evidence of carcinogenicity in experimental animals.*" (Italics added.)[5] More importantly, *the HCS defines as a "carcinogen" all substances* listed by IARC in categories 1 and 2 as well as substances identified and listed by NTP as known or probable human carcinogens (on the basis of known carcinogenicity in animals) and certain additional substances listed by OSHA. (29 C.F.R. § 1900.1200, appen. A.) Thus, all known or probable human carcinogens identified by IARC and NTP are presumed conclusively by HCS to be carcinogens and must be included on the initial list pursuant to section 25249.8, subdivision (a) and Labor Code section 6382, subdivision (d).[6]

■ Defendant claims a "literal" construction of section 25249.8, subdivision (a), will lead to absurd results, requiring the listing of substances that

---

[5] The IARC and NTP lists are in many respects duplicative. Many of the chemicals included within the IARC Group 2 and supplemental categories are also included in the NTP category of chemicals "reasonably anticipated" to cause cancer.

[6] As stated in appendix B to 29 Code of Federal Regulations section 1910.1200: "[A] determination by [NTP], [IARC] or OSHA that a chemical is a carcinogen or potential carcinogen will be considered conclusive evidence for purposes of this section."

are not known to cause cancer. Thus, the HCS referred to in Labor Code section 6382, subdivision (d) includes thousands of substances that are not carcinogens or reproductive toxins. A literal construction of the statute, defendant argues, would require the initial list to include these substances, a result the electorate clearly did not intend. Thus, concludes defendant, a reasonable construction of the statute requires a listing only of known human carcinogens.

It is true that "any substance within the scope of the federal [HCS]" (§ 6382, subd. (d)) includes chemicals other than known carcinogens. Section 25249.8, subdivision (a) and the Act itself, however, are concerned only with those substances that authoritative bodies have concluded are known to cause cancer or reproductive toxicity. Thus, the initial list, and subsequent lists published thereafter, need not include all substances listed under HCS but only known carcinogens and reproductive toxins listed there.

In fact, defendant's initial list selected from the HCS those substances that HCS deems are known to cause cancer or reproductive toxicity in humans. ■ ■■■■ The trial court's order does no more than require defendant to add to that list the substances that HCS deems are also known to cause cancer or reproductive toxicity in animals.[7]

---

[7] As noted, the Act is not expressly limited in its application to those chemicals known to cause cancer only in humans. The omission of any such limitation implies that chemicals are to be listed and hence subject to the Act even if they are known to be carcinogenic as to animals only, a fact conceded prior to the election by many if not most opponents of the Act. The qualitative assessment of carcinogenic risks to humans ordinarily is based on data from experiments in animals. (Guidelines for Chemical Carcinogen Risk Assessments and their Scientific Rationale, Cal. Health and Welfare Agency, Dept. of Health Services (Nov. 1985) p. C-20 [hereafter cited as *California Cancer Guidelines*].) It is unethical to test humans, and because of the 20-to 30-year latency period of many human cancers, epidemiological studies do not adequately warn humans and protect them from the risk of exposure to new carcinogens. (*Id.,* at p. B-10.) For recognized human carcinogens, the first evidence of carcinogenicity frequently is found in test animals; only afterwards are cancer effects looked for, and found, in humans. (*Id.,* at p. B-24.) Thus, the principle which supports qualitative animal to human extrapolation from carcinogenesis "has been accepted by all health and regulatory agencies and is regarded widely by scientists in industry and academia as a justifiable and necessary inference." (Rep., Office of Science and Technology Policy, 50 Fed.Reg. 10375 (Mar. 14, 1985).)

Indeed, the *California Cancer Guidelines* promulgated prior to the passage of Proposition 65 note that between the IARC and NTP, "[s]ufficient evidence presently exists for the carcinogenicity in animals of about 200 chemicals . . . . For most of the 200 animal carcinogens for which there is 'sufficient evidence,' it is unlikely that we will ever know with certainty whether they cause cancer in humans because of the difficulty in obtaining appropriate populations suitable for epidemiological studies. Since it is unlikely we will ever confirm or deny the apparent carcinogenic potential of these 200 chemicals, it appears prudent in the interim to control exposure to them as if they had demonstrated effects in humans." (*Id.,* at p. B-24.) Following the election, the California Department of Health Services (DHS) issued a memorandum stating in relevant part: "[T]he minimally required list has been interpreted by [DHS] to include those chemicals designated by IARC as having sufficient evidence of carci-

■ Defendant suggests the provisions of the Act are inconsistent and contradictory because only those chemicals *known to the state* to cause cancer are to be included on the list, and yet the only way a chemical can be known to the state to cause cancer is through the mechanisms provided in section 25249.8, subdivision (b), which requires a determination by the Panel.

The role of the Panel comes into play through section 25249.8, subdivision (b), which provides a means for supplementing the initial list.[8] In addition to those chemicals required to be listed by subdivision (a), other chemicals to be listed include those the Panel concludes "[have] been clearly shown through scientifically valid testing according to generally accepted principles to cause cancer or reproductive toxicity," substances that "a body considered to be authoritative by such [Panel] has formally identified . . . as causing cancer or reproductive toxicity," and any chemical that "an agency of the state or federal government has formally required [ ] to be labeled or identified as causing cancer or reproductive toxicity." (§ 25249.8, subd. (b).)

■ "It is a cardinal rule of construction that words or phrases are not to be viewed in isolation; instead, each is to be read in the context of the other provisions . . . bearing on the same subject. [Citation.] The goal, of course, is to harmonize all related provisions if it is reasonably possible to do so without distorting their apparent meaning, and in so doing to give effect to the scheme as a whole. [Citations.] Strained interpretation, or construction leading to unreasonable or impractical results, is to be avoided. [Citations.]" (*Fields* v. *Eu* (1976) 18 Cal.3d 322, 328 [134 Cal.Rptr. 367, 556 P.2d 729].)

■ The analysis that subdivision (b) is supplemental to subdivision (a) is compelled not only by a reading of the Act, but also by the ballot

nogenicity in animals and/or in humans and by NTP as having clear evidence of carcinogenicity. It is DHS's view that the inclusion of animal-derived data is scientifically and ethically *required* to be included in the Proposition 65 list. . . . [ ] It is the potential risk from exposure to such chemicals that Proposition 65 addresses, and that the voters of California so overwhelmingly endorsed. Hence, DHS *recommends that chemicals designated as carcinogens by IARC and NTP, based on results from animals experiments, be included in the initial, minimally acceptable list of cancer-causing chemicals for Proposition 65.*" (DHS Mem. (Jan. 1987) pp. 1, 3.)

Finally, the statutes and regulations governing both California and Federal OSHA are designed to protect humans in the workplace. Yet these regulatory schemes expressly impose controls on chemicals carcinogenic both to humans *and animals.* (Lab. Code, § 6382, subds. (b)(1), (d); 29 C.F.R. § 1910.1200.) Proposition 65 is in pari materia and therefore must be read in harmony with these regulatory schemes.

[8] Indeed, defendant published the initial list without prior consultation with the Panel which was not established until February 27, 1987, the same day the initial list was issued.

argument, which states: "Proposition 65's new civil offenses focus only on chemicals that are *known to the state* to cause cancer or reproductive disorders. Chemicals that are only suspect are not included. The Governor must list these chemicals, after full consultation with the state's qualified experts. At a minimum, the Governor must include the chemicals already listed as known carcinogens by two organizations of the most highly regarded national and international scientists: the U.S.'s National Toxicology Program and the U.N.'s International Agency for Research on Cancer." (Italics in original.)

The claim of inconsistency assumes the Act confides a role to the Panel in determining the minimum content of the initial list. However, section 25249.8, subdivision (a) sets forth the minimum definition of those chemicals *known to the state* to cause cancer or reproductive toxicity which is to include the known human and animal carcinogens referred to in the Labor Code. With regard to the minimum content of the initial list, this mandate is etched in stone.

Proposition 65 was not intended to produce a one-time list of known carcinogenic chemicals, but rather requires revision of the initial list annually or even more frequently. (§ 25249.8, subd. (a).) Section 25249.8, subdivision (a), insures the minimum content of the initial list, and section 25249.8, subdivision (b), directs both defendant and the Panel to engage in a diligent, thorough and continuing search for additional chemicals which evolving scientific knowledge demonstrates are subject to the Act. Viewed in this light, the provisions of section 25249.8, subdivisions (a) and (b) are not inconsistent, but complementary.

 Defendant concedes section 25249.8 imposes a ministerial duty to publish the initial list but contends the Act confers upon him the discretion to choose which substances are to be included on the initial list, and that choosing only those chemicals known to cause cancer in humans was a reasonable choice which should be sustained. With regard to the content of the initial list, however, the provisions of section 25249.8, subdivision (a), admit of no such discretion. The section uses words classically defined as imposing a mandatory duty: "Such list *shall include at a minimum* those substances identified by reference in Labor Code Section 6382(b)(1) and those substances identified additionally by reference in Labor Code Section 6382(d)." (Italics added; § 25249.8, subd. (a).) Defendant had no discretion to exclude from the initial list known carcinogenic and reproductive toxins referred to in Labor Code section 6382. Accordingly, we shall uphold the issuance of mandatory injunctive relief compelling defendant to

perform his ministerial duty in compliance with the clear terms of the Act.[9] (See *Associated Cal. Loggers, Inc.* v. *Kinder* (1978) 79 Cal.App.3d 34, 44-45 [144 Cal.Rptr. 786].)

Proposition 65 clearly reflects the result of public dissatisfaction with the state's efforts at protecting the people and their water supply from exposure to hazardous chemicals. ■■■ "[I]t is not our function to pass judgment on the propriety or soundness of [the Act]. In our democratic society in the absence of some compelling, overriding constitutional imperative, we should not prohibit the sovereign people from either expressing or implementing their own will on matters of such direct and immediate importance to them as their own perceived safety." (*Brosnahan* v. *Brown* (1982) 32 Cal.3d 236, 248 [186 Cal.Rptr. 30, 651 P.2d 274].)

The Act applies to those chemicals which respected scientific agencies have already determined cause cancer or reproductive toxicity in humans or animals. Our decision simply enforces the will of the people as so expressed.[10]

The appeal from the order overruling the demurrer is dismissed; the judgment (order) is affirmed.

Sparks, J., and Marler, J., concurred.

---

[9] Defendant does not contend he is beyond the reach of mandatory injunctive relief to compel performance of a ministerial duty.

[10] At defendant's request we take judicial notice of the work of the Panel, which as of July 1, 1989, had placed on the list approximately 200 of the 229 chemicals and reproductive toxins ordered to be placed on the initial list in the judgment of the trial court which we here affirm.