[No. C029727. Third Dist. May 9, 2000.]

WESTERN CROP PROTECTION ASSOCIATION et al., Plaintiffs and Appellants, v.
GRAY DAVIS, as Governor, etc., et al., Defendants and Respondents.

## COUNSEL

McCutchen, Doyle, Brown & Enersen, Patricia L. Shanks, Barry P. Goode, A. Joshua Henig and Lonnie Finkel for Plaintiffs and Appellants.

Daniel E. Lungren and Bill Lockyer, Attorneys General, Roderick E. Walston, Chief Assistant Attorney General, Theodora P. Berger and Richard M. Frank, Assistant Attorneys General, Craig C. Thompson and Edward G. Weil, Deputy Attorneys General, for Defendants and Respondents.

Altshuler, Berzon, Nussbaum, Berzon & Rubin, Michael Rubin, Christopher Pederson; Milberg, Weiss, Bershad, Hynes & Lerach, Albert M. Meyerhoff; and David B. Roe for Natural Resources Defense Council, AFL-CIO, United Farm Workers, Environmental Defense Fund, Sierra Club, Pesticide Action Network, California Public Interest Research Group Charitable Trust, Pesticide Watch Education Fund and Environmental Defense Center as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**BLEASE, J.**—This is an appeal from an adverse judgment in an action seeking a writ of mandate to prohibit the Governor from publishing a list of

chemicals as known to the state to cause reproductive toxicity, as provided in Proposition 65, an initiative adopted at the November 1986 General Election.

The initiative, designed to protect the people and their water supplies from harmful chemicals, added sections 25249.5 through 25249.13 to the Health and Safety Code. Section 25249.8 requires the Governor to publish, at least annually, a list of chemicals known to the state to cause reproductive toxicity (the Proposition 65 list).

The plaintiffs (collectively Western Crop Protection), organizations representing businesses related to agriculture, contend the challenged list, adopted from a list of chemicals established by the federal Environmental Protection Agency (EPA) does not comply with Health and Safety Code section 25249.8.

We will conclude the trial court did not err in denying a writ of mandate. Western Crop Protection has failed to show that the state defendants violated a plain legal duty in placing the chemicals on the Proposition 65 list. Although the federal definition, which provides criteria for listing toxic chemicals by the EPA, may be broader than the state definition, a question we do not resolve on this record, the state may determine that the criteria used by the EPA in placing a particular chemical on the EPA list satisfies the state definition.

We will affirm the judgment.

### FACTS AND PROCEDURAL BACKGROUND

Proposition 65 enacted Health and Safety Code section 25249.8 (hereafter section 25249.8), which provides, in pertinent part, as follows:

"(a) On or before March 1, 1987, the Governor shall cause to be published a list of those chemicals known to the state to cause cancer or reproductive toxicity within the meaning of this chapter, and he shall cause such list to be revised and republished in light of additional knowledge at least once per year thereafter. Such list shall include at a minimum those substances identified by reference in Labor Code Section 6382(b)(1) and those substances identified additionally by reference in Labor Code Section 6382(d).

"(b) A chemical is known to the state to cause cancer or reproductive toxicity within the meaning of this chapter if in the opinion of the *state's*

*qualified experts* it has been clearly shown through scientifically valid testing according to generally accepted principles to cause cancer or reproductive toxicity, or if *a body considered to be authoritative* by such experts has formally identified it as causing cancer or reproductive toxicity, or if an agency of the state or federal government has formally required it to be labeled or identified as causing cancer or reproductive toxicity." (Italics added.)

In this case we are concerned only with reproductive toxicity. Under section 25249.8 there are two methods for determining whether a substance should be listed as a "chemical . . . known to the state to cause . . . reproductive toxicity . . . ." The first involves the judgment of the state's qualified experts that a chemical "has been clearly shown through scientifically valid testing according to generally accepted principles to cause . . . reproductive toxicity . . . ." The second involves the judgment of a body, considered to be authoritative by the state's experts, that has formally identified a chemical as causing reproductive toxicity.

The state Office of Environmental Health Hazard Assessment (OEHHA), within the California Environmental Protection Agency, has promulgated regulations to implement section 25249.8. (See Cal. Code Regs., tit. 22, § 12301 et seq.)[1] The regulations assign the task of implementing the section to two administrative bodies. The Developmental and Reproductive Toxicant Identification Committee (the DART Committee) is designated as the "state's qualified experts" to "[r]ender an opinion . . . whether specific chemicals have been clearly shown . . . to cause reproductive toxicity." (§ 12305, subd. (b)(1).) The OEHHA itself, as the lead agency, is charged with making the "determination" whether "chemicals have been formally identified by an authoritative body as causing . . . reproductive toxicity." (§ 12306, subds. (c) & (d).) The EPA is designated by the DART Committee as a body considered to be authoritative. (§ 12306, subd. (*l*)(3).)

On November 30, 1994, the EPA promulgated a final rule in the federal register adding 286 chemicals and chemical categories to the list of chemicals subject to reporting under the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. §§ 11001-11050; hereafter Emergency Planning Act), the Toxics Release Inventory (hereafter the TRI list). (See, e.g., *Troy Corp. v. Browner* (D.C. Cir 1997) 120 F.3d 277, 280 [326 App. D.C. 249] [upholding most of the listings as valid under the Emergency Planning Act].) Of these, 66 are chemicals used in agriculture (hereafter the disputed TRI chemicals) that were added to the TRI list on the finding they cause or can be reasonably anticipated to cause reproductive toxicity.

---

[1]A reference to a section is to a section of the California Code of Regulations, title 22, or to section 25249.8 of the Health and Safety Code, unless otherwise indicated.

On March 3, 1997, the National Resources Defense Council (NRDC) sent a letter to former Governor Wilson complaining that all of these chemicals should have been listed because "a body considered to be authoritative . . . has formally identified [them] as causing . . . reproductive toxicity . . . ."[2] OEHHA responded to the complaint by conducting a chemical-by-chemical evaluation, "relying on the studies that form the basis for the TRI identification," to determine which of the disputed TRI chemicals warranted a notice of intention to list them under the regulation.

On August 22, 1997, OEHHA published an announcement in the California Regulatory Notice Register that it was "investigating the possible listing of" several of the disputed TRI chemicals and requesting comment on or before October 21, 1997. Section 12306, subdivision (i) provides a procedure by which a proposed listing by the OEHHA may be challenged on the ground "there is no substantial evidence that the criteria" for listing have been satisfied. The regulation provides that the OEHHA shall make that determination.

Western Crop Protection did not avail itself of this procedure. Rather, on October 15, 1997, it filed a complaint for mandamus and declaratory relief to prohibit any such listing, naming as defendants the Governor and other state officials and agencies (hereafter the State).

The matter came on for trial based upon documents submitted by the parties. The trial court denied Western Crop Protection the relief sought.

Additional facts will be introduced in the course of the discussion of the contentions of error.

DISCUSSION

I

The crux of the dispute is whether the OEHHA has usurped the functions of the DART Committee in deciding to place certain of the disputed chemicals on the list as chemicals known to cause reproductive toxicity on the ground of their formal identification by the EPA. That puts in issue the meaning of the relevant statutes and regulations.

As related, section 25249.8, subdivision (b), provides that "[a] chemical is known to the state to cause . . . reproductive toxicity within the meaning of

---

[2]In August 1997 NRDC and others (collectively NRDC) sued to speed up the process of adding disputed TRI chemicals to the Proposition 65 list. That action was consolidated for trial with the one before us on appeal. In pertinent part, the NRDC petition was denied without prejudice to renewal. NRDC has not appealed that disposition but has filed an amicus curiae brief in support of the state.

this chapter . . . if a body considered to be authoritative . . . has formally identified it as causing . . . reproductive toxicity . . . ."

As noted, the EPA is such a body. (§ 12306, subd. (*l*)(3).) The material question therefore is whether in promulgating the TRI list the EPA has "formally identified [chemicals on the list] as causing . . . reproductive toxicity" within the meaning of section 25249.8.

Western Crop Protection notes that under the federal Emergency Planning Act a chemical may be included not only if it is "known to cause" but also, alternatively, if it "can reasonably be anticipated to cause" reproductive toxicity. Western Crop Protection argues the latter is a standard which differs from the state standard that the chemical is "known to the state to cause . . . reproductive toxicity."[3] It notes the TRI list fails to state upon which of the alternate bases a chemical was listed.

The argument tacitly assumes the federal known-to-cause standard is the same as the California standard, from which Western Crop Protection reasons that "[t]he two alternative standards demonstrate that Congress intended the phrase 'reasonably anticipated' to have a different and less stringent meaning from 'known' to cause.' " It further assumes the OEHHA, in employing the TRI list, has transgressed the authority of the DART Committee in determining which chemical on the list satisfies the California standard.

The State replies that the different language used in articulating the standards under the Emergency Planning Act does not preclude the OEHHA from finding the EPA made the requisite identification if the section 25249.8 criteria are met. The State submits that, regardless of the semantic formulation used by the EPA, OEHHA can examine the data on which the EPA acted to determine if the TRI listing satisfies the state standard as identifying a chemical as causing reproductive toxicity.

As will appear, we agree with the assumption the federal "known to cause" standard is the same as the California standard. However, we cannot

---

[3]The Emergency Planning Act, at 42 United States Code section 11023(d)(2), in pertinent part, provides for adding chemicals to the TRI list when, "based on generally accepted scientific principles or laboratory tests, or appropriately designed and conducted epidemiological or other population studies," there is "sufficient evidence to establish[:] [¶] . . . [¶]

"(B) The chemical is known to cause or can reasonably be anticipated to cause in humans— [¶](i) . . . teratogenic effects, or [¶] (ii) serious or irreversible— [¶](*l*) reproductive dysfunctions, . . . [¶] (*lll*) heritable genetic mutations . . . ."

"[T]eratogenic effects. The tendency of a medicine, administered to a pregnant woman, to cause the development of birth defects in the fetus . . . ." (5 Schmidt, Attorney's Dict. of Medicine, p. T-53.)

determine on this record whether the alternative federal TRI definition is broader than the California definition. Assuming for the sake of discussion that it is, Western Crop Protection must also demonstrate that the procedure used by OEHHA to select the chemicals from the TRI list as satisfying the California standard involves the kind of judgment assigned to the DART Committee under Proposition 65. We conclude that on this record it has failed to do so.

II

■ We first examine Western Crop Protection's assumption that the EPA definition of "known to cause . . . reproductive toxicity" is the same as the California definition of "known to . . . to cause . . . reproductive toxicity . . . ."

In *AFL-CIO v. Deukmejian* (1989) 212 Cal.App.3d 425, 436-437 [260 Cal.Rptr. 479], this court decided that "only those chemicals that are known, and not merely suspected, of causing cancer or reproductive toxicity must be [placed] on the [Proposition 65] list." We also decided the statutory phrase "chemicals known to the state to cause cancer" includes chemicals "even if they are known to be carcinogenic as to animals only . . . ." (*Id.* at p. 438, fn. 7.) We explained that in view of the ethical prohibition in testing humans, the broad scientific acceptance of the inference that carcinogenicity in other animals means carcinogenicity in humans, and the history and purposes of Proposition 65, this reading is compelled. (*Id.* at pp. 438-439.) Accordingly, we directed inclusion of chemicals on the Proposition 65 list as probable human carcinogens for which there was sufficient evidence of carcinogenicity in experimental animals.

The same logic applies to the construction of "causes . . . reproductive toxicity" in section 25249.8. That requirement can be "satisfied" by "[s]tudies in experimental animals [which] indicate . . . an association between adverse reproductive effects in humans and the toxic agent in question is biologically plausible." (§ 12306, subd. (g)(2).)

As related, the statutory standard for inclusion of a chemical on the TRI list is satisfied by sufficient evidence, based on generally accepted scientific principles or laboratory tests, or appropriately designed and conducted epidemiological or other population studies to establish the chemical "is known to cause or can reasonably be anticipated to cause" reproductive toxicity in humans. (42 U.S.C. § 11023(d)(2) [See fn. 3, *ante*].)

Thus, the federal standard, "known to cause," is, as Western Crop Protection assumes, the same as the California standard.

III

Western Crop Protection argues that the phrase "can reasonably be anticipated to cause . . . reproductive toxicity" is a "much less rigorous criterion" for identification than the criterion "causing . . . reproductive toxicity" in section 25249.8.

The phrase in the Emergency Planning Act is ambiguous on its face. One might reasonably anticipate a causal connection where evidence affords an inference that more likely than not such a connection obtains.[4] One might also reasonably anticipate such a connection when the inference is less than likely.

Thus, where the consequences of a possible causal connection are serious, it could be reasonable to anticipate a causal connection even though a preponderance of the evidence does not support that inference. For example, where death is certain to occur if a condition is met, it may be reasonable to anticipate that condition, e.g., to take precautions against it, even though the likelihood is only one in three. If the latter is a permissible reading under the federal law the TRI could contain chemicals that are not "known to the state to cause" reproductive toxicity under section 25249.8.

Western Crop Protection submits that such a discrepancy between the reasonable-to-anticipate TRI standard and the Proposition 65 standard is demonstrated in an EPA document entitled "Revised Draft Hazard Assessment Guidelines for Listing Chemicals on the Toxic Release Inventory" (hereafter Guidelines). Western Crop Protection points to provisions of the Guidelines which say that chemicals for which there is only evidence suggesting possible toxicity or evidence of possible positive or possible negative effects "may be sufficient for listing" and then evaluated on a

---

[4]For example, *AFL-CIO v. Deukmejian, supra*, 212 Cal.App.3d 425, impliedly discerned such a definition under other provisions of federal law in the following passage.

"The same analysis requires the initial list to include those carcinogens within the scope of the HCS. (Lab. Code, § 6382, subd. (d).) As noted, the HCS includes, inter alia, substances included in the *Annual Report on Carcinogens* published by the NTP. (29 C.F.R. § 1910.1200, appen. A.) Like the IARC, the NTP divides carcinogens into categories: 'known' carcinogens and those chemicals 'reasonably anticipated' to be carcinogens. The NTP report states: 'For the purpose of this Report, "known carcinogens" are defined as those substances for which the evidence from human studies indicates that there is a causal relationship between exposure to the substance and human cancer. Substances *"which may reasonably be anticipated to be carcinogens"* are defined as those for which there is a limited evidence of carcinogenicity in humans or sufficient evidence of carcinogenicity in experimental animals.' (Italics added.)" (*AFL-CIO v. Deukmejian, supra,* 212 Cal.App.3d at p. 437, fns. omitted, original italics.)

case-by-case basis for addition to the TRI list.[5] It argues that these provisions show the EPA standard allows placement of chemicals on the TRI list with less than sufficient evidence to afford an inference that more likely than not they cause reproductive toxicity.

The dichotomy in the Guidelines suggests that chemicals could be placed on the TRI list even though there is less than sufficient evidence to afford an inference of a causal connection between exposure and developmental abnormality.

Our reservation is occasioned by the lack of information concerning the criteria for a case-by-case evaluation of chemicals that "may be sufficient for listing" for addition to the TRI list. It is possible that these criteria amount to an inference of causation.[6]

Because there is a significant question of federal law, the record is incomplete, and the briefs inadequate to dispel the uncertainty of meaning, we express no final view on the meaning of "can reasonably be anticipated to cause [reproductive toxicity]."

## IV

█ However, assuming that the TRI standard is less than that for Proposition 65, it does not follow that it is improper for the state to find that a *particular* chemical has been placed on the TRI list, "i.e., formally

---

[5]Western Crop Protection relies on the following two paragraphs of the Guidelines.

"In summary, chemicals with sufficient animal or human evidence for developmental toxicity are considered 'sufficient for listing' and may be added to the [TRI list] following study validation. Chemicals with insufficient evidence, but for which evidence suggesting possible developmental toxicity exists, 'may be sufficient for listing' and are reviewed on a case-by-case basis for addition to the list."

"In summary, chemicals with known and probable positive reproductive effects are considered 'sufficient for listing' and may be added to the [TRI list] following study validation, whereas chemicals with possible positive [e.g., "studies with acceptable quality produce inconsistent and conflicting results such that the possibility of adverse effects cannot be discounted"] or possible negative [i.e., "studies with acceptable quality produce no adverse effects, but important aspects of the reproductive system have not been evaluated] effects 'may be sufficient for listing' and are evaluated on a case-by-case basis for addition to the list."

[6]For example, the EPA-proposed rule concerning these additions to the TRI list contains the following assertions about the hazard assessment process. "Where a careful review of the scientific data for a particular chemical results in a high level of confidence that the chemical causes an adverse effect at relatively low dose levels, EPA believes that this evidence is sufficient for listing the chemical [on the TRI list]. On the other hand, where a review of the scientific data indicates that the chemical will cause various adverse effects at moderate dose levels, EPA believes, based on the total weight-of-the-evidence, that there is sufficient evidence for listing the chemical [on the TRI list]."

identified," by the EPA "as causing . . . reproductive toxicity." It can do so by determining whether the reasons for the EPA placement meet the criteria of section 25249.8.

A.

It is conceded the chemicals from the TRI list that have been placed on the California list are there because of EPA's findings they cause or can reasonably be anticipated to cause reproductive toxicity in humans. If it can be objectively ascertained that the reason the EPA placed a particular chemical on the TRI list is because it found sufficient evidence of reproductive toxicity to qualify under the California definition, that suffices to meet the criteria of the California law.

In its most simple form the problem is as follows. If there are two standards, A and B, for placing a chemical on a list, one of which (the A list) meets the California standard and the other (the B list) does not, and the list does not discretely distinguish between the A and B chemicals, by what measure is the OEHHA to distinguish the two?

Suppose an expert defines a term as including two discrete categories, and then identifies items satisfying each category. If you are compiling a list of one of those categories, in some circumstances you may cull the expert's list of the items that are not in your category. What remains is a list of items in your category that have been identified (or authorized) by the expert. For example, an expert critic compiles a list of good books for summer reading, consisting of mystery books and science fiction books. If there is no expertise required in deciding whether a book is a mystery or a work of science fiction, you may then compile from the combined list a list of mystery books authorized by an expert, notwithstanding that the expert's list does not explicitly assert whether a book is a mystery or in the science fiction genre.

Now suppose it is possible to determine from the record of the TRI list proceedings, without the use of expertise assigned to the DART Committee, whether a particular chemical was added to the list because, under the Guidelines (see fn. 5, *ante*), (1) it was found "sufficient for listing" or (2) because it was initially found "may be sufficient for listing" and later determined suitable after a case-by-case review. In this circumstance there would be no impediment to OEHHA adopting chemicals in the former category for placement on the Proposition 65 list. Similarly, chemicals could be lawfully adopted if the record of the TRI list proceedings permits a reviewer to determine, without the use of expertise assigned to the DART

Committee, if they were added to the TRI list because the evidence meets the Proposition 65 list standard. (See fn. 6, *ante*.)

B.

The question is whether this can be done under section 12306 of the regulations enacted by the OEHHA to implement Proposition 65. Because no focused claim has been made whether the regulations comply with section 25249.8, we will assume for purposes of this opinion that they do.

Section 12306 designates the EPA as a body considered to be authoritative by the state's qualified experts (§ 12306, subd. (*l*)(3)) and provides that the lead agency (the OEHHA) "shall determine which chemicals have been formally identified by an authoritative body as causing . . . reproductive toxicity." (§ 12306, subd. (c)).

Section 12306, subdivision (d)(1), in pertinent part, defines "formally identified," as "the chemical has been included on a list of chemicals causing . . . reproductive toxicity issued by the authoritative body . . . ."

Section 12306, subdivision (g), defines the phrase "as causing reproductive toxicity," as follows:

"(g) For purposes of this section, 'as causing reproductive toxicity' means that either of the following criteria have been satisfied:

"(1) Studies in humans indicate that there is a causal relationship between the chemical and reproductive toxicity, or

"(2) Studies in experimental animals indicate that there are sufficient data, taking into account the adequacy of the experimental design and other parameters such as, but not limited to, route of administration, frequency and duration of exposure, numbers of test animals, choice of species, choice of dosage levels, and consideration of maternal toxicity, indicating that an association between adverse reproductive effects in humans and the toxic agent in question is biologically plausible."

Section 12306, subdivision (i) implies the OEHHA has the authority to apply these criteria to the administrative record on which the EPA placed a chemical on the TRI list to determine whether the chemical meets the California definition. It provides the OEHHA shall "review . . . objections" to the placement of a chemical of the Proposition 65 list made on the ground

"there is no substantial evidence that the criteria identified in . . . subsection (g) have been satisfied" and determine whether that standard has been met.[7]

The measure of this latter authority is implied from the provisions of section 12306, subdivision (i), pursuant to which the OEHHA is to review an objection to the selection of a chemical from the authoritative body's list. It provides in pertinent part that "[i]f the lead agency finds that there is no substantial evidence that the criteria identified in . . . subsection (g) have been satisfied, the lead agency shall refer the chemical to the [DART Committee]" for its determination. The clear implication is that the OEHHA has the authority to examine the record of the TRI listing to determine whether there is substantial evidence that the subdivision (g) criteria have been met. As noted above, subdivision (g) defines "as causing reproductive toxicity" for purposes of determining, pursuant to subdivision (d), whether a chemical has been formally identified by an authoritative body as causing reproductive toxicity.

We conclude that under section 12306, OEHHA has the authority to examine the administrative record of the TRI procedure to determine if there is substantial evidence that the EPA has placed a chemical on the EPA list because it meets the state's criteria of "causing . . . reproductive toxicity." If so, from all that is made to appear on this record, the federal criteria of "sufficient for listing" are also met. Accordingly, the fact that the federal standard may be broad enough to allow inclusion of chemicals on the TRI that do not satisfy the California standard does not prevent OEHHA from determining that a chemical was placed on the TRI by EPA "as . . . causing reproductive toxicity."

### C.

Finally, Western Crop Protection contends the trial court erred in deciding that inclusion of a chemical on the TRI list by the EPA constitutes a formal identification of it as causing reproductive toxicity, because the EPA disclaimed that proposition in letters adduced in the trial court.

The State replies that Western Crop Protection mischaracterizes the letters. The portions of the letters to which Western Crop Protection points do not advance its case.

---

[7] If OEHHA finds "there is no substantial evidence that the criteria . . . have been satisfied" it shall refer the chemical to the DART Committee for its determination whether in its opinion "the chemical has been clearly shown through scientifically valid testing according to generally accepted principles to cause cancer or reproductive toxicity." (§ 12306, subd. (i).)

The dispute is predicated upon two letters sent from Dr. Lynn Goldman, Assistant Administrator, Office of Prevention, Pesticides, and Toxic Substances, EPA, to OEHHA officials. Only one of them is material.[8] It responds to an inquiry from OEHHA asking if, in placing certain of the disputed TRI chemicals on that list, EPA had concluded the criteria stated in section 12306, subdivision (g)(1) or (2) were satisfied. Dr. Goldman responded, in pertinent part, as follows.

The chemicals are determined to meet the listing criteria of the Emergency Planning Act "due to reproductive or developmental effects observed in animal studies."

"As I indicated in my January 15, 1997, letter to the Director of your Office, Dr. Richard A. Becker, as a general matter, EPA does not at this time formally classify or label chemical substances as reproductive toxicants for all purposes. Whether a specific EPA action can be considered to be a formal designation may depend upon the nature and requirements of the statute under which the action is being taken. For example, EPCRA section 313 is a right-to-know section of the statute that does not impose any restrictions on the manufacture, processing, use or disposal of any listed chemical. Therefore, the level of certainty for meeting the statutory criteria under EPCRA section 313 may be considered to be lower than for statutes that impose actual restrictions. In adding the chemicals in question to the EPCRA section 313 list, EPA made the determination that these chemicals met the statutory requirements for listing under EPCRA section 313(d)(2)(B). While there is some similarity between the language of EPCRA section 313(d)(2)(B) and Proposition 65 language, whether EPA's determination that the chemicals in question meet the EPCRA section 313 listing criterion means that either the (a) or (b) [provisions of § 13206] criterion of 'Proposition 65' has been met, is a determination that must be left to the state of California." (Original brackets.)

Western Crop Protection seeks to use this disclaimer as authority for the conclusion that in placing the disputed TRI chemicals on the federal list EPA had not "formally identified [chemicals on the list] as causing . . . reproductive toxicity . . . ."

The claim makes no sense. EPA is considered by OEHHA to be a "body considered to be authoritative" for purposes of such an identification.

---

[8]As to the other letter, it suffices to say that it pertains to a chemical not included on the TRI list and contains nothing noteworthy.

However, it is immaterial whether Dr. Goldman, or anyone else at EPA, believes the EPA's action satisfies the criteria of section 25249.8.

As Dr. Goldman correctly notes, the question is one for the State. ■ It is a question of California law whether the EPA action satisfies the statutory criteria of "formally identified [chemicals on the list] as causing . . . reproductive toxicity . . . ." This is not a question involving the mental state of EPA officials. Evidence of what EPA did is relevant and material; evidence of the opinion of an EPA official about the requirements of California law is not.

Western Crop Protection contends the trial court erred in failing to grant relief on its claim that the listing process of OEHHA for disputed TRI chemicals is unlawful because OEHHA considers materials that were not considered by the EPA. The State replies that it does not consider materials that were not considered by the EPA.

Western Crop Protection quotes the following excerpt in the announcement of proposed rulemaking by EPA for these additions to the TRI list: "The information summarized below for each chemical or chemical category represents the key data elements that lead EPA to believe that there is sufficient evidence to establish that one of the [TRI] listing criteria is met. A more extensive review of the existing data base for each chemical or chemical category proposed for listing, which reflects the entire weight-of-the-evidence considered by EPA, is contained in following support documents: [5 references listed] . . . ."

Western Crop Protection submits this shows the EPA reviewers did not look at the actual studies cited in the summary information, but only summaries of the data from the studies. It argues that since the EPA did not use the actual studies, OEHHA cannot use the actual studies, but can only look to the summary data, which an OEHHA official had described, in a letter to NRDC, as inadequate to warrant listing under Proposition 65.

Western Crop Protection makes an across-the-board attack upon all of the TRI chemicals placed on the Proposition 65 list on the ground that OEHHA looked at original studies referred to in secondary sources which were not contained in the administrative record of the EPA proceedings.

However, the success of such a challenge is dependent upon a showing that evidence contained in original studies not considered by the EPA was material, i.e., was necessary to sustain the inference that EPA put the chemical on the TRI list for reasons which satisfy the Proposition 65 criteria.

If OEHHA placed a particular chemical on the Proposition 65 list on the basis of information in an original study not considered by the EPA, a challenge to the listing would be warranted on grounds of materiality. As noted, such a challenge may be made pursuant to the procedures provided for in section 12306, subdivision (i). However, there is no evidence in the record that Western Crop Protection employed this procedure.

Lacking such a particularized showing of materiality regarding each of the chemicals on the Proposition 65 list, Western Crop Protection cannot sustain its facial challenge to the entire list on the ground OEHHA looked beyond the EPA record.

V

Western Crop Protection contends the trial court erred in denying the writ of mandate because it incorrectly found that inclusion of a chemical on the TRI list is a formal identification of a chemical by EPA as causing reproductive toxicity.

In a mandate proceeding, the party seeking the writ must show a clear and present duty of the respondent to act in conformity with the proposed writ. (See, e.g., 8 Witkin, Cal. Procedure (4th ed. 1997) Extraordinary Writs, § 72, p. 853.) In this case the duty claimed is a duty to remove from the Proposition 65 list the chemicals adopted from the TRI list. As the party seeking a judicial remedy, Western Crop Protection bears the burden of showing the OEHHA action in processing any disputed TRI chemical for listing under Proposition 65 is inconsistent with the governing statute, section 25249.8. Its claim is that, in determining whether there is substantial evidence in the TRI administrative record to support an inference that a chemical is a reproductive toxin, OEHHA encroaches on the role of the DART Committee to opine whether a chemical "has been clearly shown through scientifically valid testing according to generally accepted principles to cause . . . reproductive toxicity."

However, Western Crop Protection fails to show that a determination whether there is substantial evidence in the TRI administrative record to support an inference that a chemical is a reproductive toxin is the same determination assigned to the DART Committee by the statute.

In our system of jurisprudence, this court has authority to ascertain whether there is substantial evidence in support of a finding of fact by the trier of fact. To do so is not an encroachment upon the authority or the role of the trier of fact to draw inferences; we are bound by the rule that all

conflicting inferences must be drawn in favor of the judgment. ▮▮▮ We are given no reason to prevent OEHHA from maintaining by analogy that it may determine the existence vel non of substantial evidence to support an inference (by EPA) of reproductive toxicity without encroaching upon the role of the DART Committee. Under the analogy used in Discussion part IV.A., one can take the mysteries from the expert's list of good books for summer reading, even though not authorized to determine that a book is suitable for that purpose.

None of the other points raised warrant discussion. None of the contentions of error advanced by Western Crop Protection have merit.

DISPOSITION

The judgment is affirmed.

Scotland, P. J., and Callahan, J., concurred.

A petition for a rehearing was denied June 8, 2000, and the opinion was modified to read as printed above.