[No. C064301. Third Dist. Oct. 31, 2012.]

STYRENE INFORMATION AND RESEARCH CENTER, Plaintiff and Respondent, v.
OFFICE OF ENVIRONMENTAL HEALTH HAZARD ASSESSMENT, Defendant and Appellant;
CELANESE CORPORATION, Intervener and Respondent.

COUNSEL

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Ken Alex, Assistant Attorney General, Susan S. Fiering and Harrison Pollak, Deputy Attorneys General, for Defendant and Appellant.

Greenberg Traurig, Gene Livingston, Lisa L. Halko, Nancy J. Doig and Wim Van Rooyen for Plaintiff and Respondent.

Bingham McCutchen, Rick R. Rothman and Colin C. West for Intervener and Respondent.

OPINION

**HULL, J.**—Proposition 65, an initiative measure adopted by the voters in 1986, enacted the Safe Drinking Water and Toxic Enforcement Act of 1986

(hereafter Proposition 65) (Health & Saf. Code, § 25249.5 et seq.; further undesignated section references are to the Health and Safety Code). Proposition 65 requires the Governor to maintain a list of chemicals known to the state to cause cancer or reproductive toxicity. (§ 25249.8, subd. (a).) Once a chemical is placed on the list, businesses that manufacture, import or use such chemicals are subject to various restrictions. (See, e.g., §§ 25249.5, 25249.6.)

At a minimum, the Proposition 65 list must include substances identified by reference in Labor Code section 6382, subdivisions (b)(1) and (d). (§ 25249.8, subd. (a).) Labor Code section 6382, subdivision (d), identifies by reference "any substance within the scope of the federal Hazard Communication Standard (29 C.F.R. Sec. 1910.1200) . . . ." The Hazard Communication Standard (HCS) in turn identifies several sources "as establishing that a chemical is a carcinogen or potential carcinogen," including "International Agency for Research on Cancer (IARC) *Monographs* (latest editions)." (29 C.F.R. § 1910.1200(d)(4)(ii) (2012).)

The International Agency for Research on Cancer (IARC) categorizes chemicals into groups based on level of carcinogenicity. "Group 1" chemicals are those known to cause cancer in humans; "Group 2A" chemicals are those that are "probably" carcinogenic to humans, based on sufficient evidence of carcinogenicity in experimental animals; "Group 2B" chemicals are those that are "possibly" carcinogenic to humans, based on various combinations of limited or inadequate evidence of carcinogenicity in humans, evidence of carcinogenicity in experimental animals, and supporting evidence from mechanistic and other relevant data; "Group 3" encompasses chemicals for which there is inadequate evidence of carcinogenicity in either humans or animals; and "Group 4" chemicals are those for which there is evidence that they do not cause cancer in either humans or animals.

In *AFL-CIO v. Deukmejian* (1989) 212 Cal.App.3d 425 [260 Cal.Rptr. 479] (*Deukmejian*), this court concluded a chemical must be included on the Proposition 65 list if it is identified by reference in Labor Code section 6382, subdivision (d), as one known to cause cancer in either humans or animals.

The issue presented in this matter is whether chemicals categorized in Group 2B by an IARC monograph may be included on the Proposition 65 list. The trial court answered the question in the negative, and we agree. Notwithstanding the requirement in Health and Safety Code section 25249.8, subdivision (a), that the list contain, at a minimum, the substances identified by reference in Labor Code section 6382, subdivision (d), that Labor Code provision addresses "hazardous substances," which extends beyond those that cause cancer or reproductive toxicity. Thus, the reference to Labor Code

section 6382 in Health and Safety Code section 25249.8, subdivision (a), must be read in conjunction with the prior language requiring the Governor to publish a list of chemicals "known to the state to cause cancer or reproductive toxicity." Because chemicals may be included in IARC Group 2B based on less than sufficient evidence of carcinogenicity in either humans or experimental animals, they may not qualify for Proposition 65 listing on that basis alone.

In this matter, defendant Office of Environmental Health Hazard Assessment (OEHHA), the state agency charged with implementing Proposition 65, published a notice entitled, "Request for Comments on Chemicals Proposed for Listing by the Labor Code Mechanism." The notice identified two chemicals, styrene and vinyl acetate, that had previously been identified in IARC monographs as possible carcinogens within Group 2B.

Plaintiff Styrene Information and Research Center (SIRC) filed this action to prohibit the listing of styrene. Celanese Corporation (Celanese) intervened in the action to prohibit the listing of vinyl acetate. SIRC and Celanese (hereafter plaintiffs) argued there was insufficient evidence either chemical was a *known* carcinogen. OEHHA argued in opposition that both chemicals met the statutory definition of known carcinogens within the meaning of section 25249.8, subdivision (a). The trial court entered judgments on the pleadings for plaintiffs, and OEHHA appeals. We affirm the judgments.

STATUTORY BACKGROUND

"Proposition 65 imposes two significant requirements on businesses. First, it prohibits businesses from discharging into drinking water sources any chemical 'known to the state to cause cancer or reproductive toxicity' (the discharge prohibition). (§ 25249.5.) Second, it requires businesses to provide a public warning if they 'knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity' (the warning requirement). (§ 25249.6.)" (*California Chamber of Commerce v. Brown* (2011) 196 Cal.App.4th 233, 238–239 [126 Cal.Rptr.3d 214] (*Brown*).)[1] The discharge prohibition becomes effective 20 months after a chemical is added to the Proposition 65 list. (§ 25249.9, subd. (a).) The warning requirement goes into effect 12 months after a chemical is first listed. (§ 25249.10, subd. (b).) "A business that violates the discharge prohibition or warning requirement can be sued in a public or private enforcement action and is subject to injunctive relief and civil penalties. (§ 25249.7, subds. (a), (b).)" (*Brown*, at p. 239.)

---

[1] OEHHA has requested we take judicial notice of *Brown*. (Evid. Code, § 451, subd. (a).) We grant the request.

Section 25249.8, subdivision (a), reads: "On or before March 1, 1987, the Governor shall cause to be published a list of those chemicals *known to the state to cause cancer or reproductive toxicity within the meaning of this chapter*, and he shall cause such list to be revised and republished in light of additional knowledge at least once per year thereafter. Such list shall include at a minimum those substances identified by reference in Labor Code Section 6382(b)(1) and those substances identified additionally by reference in Labor Code Section 6382(d)." (Italics added.) Section 25249.8, subdivision (b), defines the phrase "known to the state to cause cancer or reproductive toxicity within the meaning of this chapter" to include instances where: "[(1)] in the opinion of the state's qualified experts it has been clearly shown through scientifically valid testing according to generally accepted principles to cause cancer or reproductive toxicity, or [(2)] if a body considered to be authoritative by such experts has formally identified it as causing cancer or reproductive toxicity, or [(3)] if an agency of the state or federal government has formally required it to be labeled or identified as causing cancer or reproductive toxicity." (§ 25249.8, subd. (b).) Section 25249.8, subdivision (b), essentially provides a means by which the Proposition 65 list may be supplemented beyond the minimum requirements of section 25249.8, subdivision (a). (*Deukmejian, supra*, 212 Cal.App.3d at pp. 439–440.)

■ Health and Safety Code section 25249.8, subdivision (a), requires the listing of chemicals identified by reference in Labor Code section 6382, subdivisions (b)(1) or (d). "Labor Code section 6382 is part of the Hazardous Substances Information and Training Act (HSITA) (Lab. Code, § 6360 et seq.) and sets forth criteria for the preparation and amendment of a list of 'hazardous substances' in the workplace (*id.*, § 6380), known as the 'HSITA list.' (*Id.*, § 6380.)" (*Brown, supra*, 196 Cal.App.4th at p. 240.)

Labor Code section 6382, subdivision (b), identifies the hazardous substances to be included on the Hazardous Substances Information and Training Act (HSITA) list. Subdivision (b)(1) refers to "[s]ubstances listed as human or animal carcinogens by the [IARC]." Section 6382, subdivision (d) further provides that, "in addition to those substances on the director's list of hazardous substances, any substance within the scope of the federal Hazard Communication Standard (29 C.F.R. Sec. 1910.1200) is a hazardous substance subject to this chapter."

The HCS "was created in 1983, pursuant to title 29 United States Code section 655," which "authorized the Department of Labor, through the Occupational Safety and Health Administration (OSHA), to promulgate 'a final occupational safety and health standard entitled "Hazard Communication" (29 CFR § 1910.1200).' (48 Fed.Reg. 53280 (Nov. 25, 1983).)" (*Brown, supra*, 196 Cal.App.4th at p. 241.)

██ Two provisions of the HCS require a manufacturer, importer or employer to treat a chemical as a hazardous substance if it is identified as such by certain sources. (*Brown, supra,* 196 Cal.App.4th at p. 241.) One such provision is relevant to the present matter. Subpart (d)(4) identifies the following sources as establishing that a chemical is "a carcinogen or potential carcinogen for hazard communication purposes: [¶] (i) National Toxicology Program (NTP), *Annual Report on Carcinogens* (latest edition); [¶] *(ii) International Agency for Research on Cancer (IARC) Monographs (latest editions)*; or [¶] (iii) 29 C.F.R. part 1910, subpart Z, Toxic and Hazardous Substances, Occupational Safety and Health Administration." (29 C.F.R. § 1910.1200(d)(4) (2012), italics added.)

A 2006 preamble to the *"IARC Monographs on the Evaluation of Carcinogenic Risks to Humans,"* which describes the scientific principles and procedures used in developing IARC monographs, contains a description of the various categories in which tested substances are placed.

Group 1 consists of substances determined to be carcinogenic to humans and is described as follows: "This category is used when there is *sufficient evidence of carcinogenicity* in humans. Exceptionally, an agent may be placed in this category when evidence of carcinogenicity in humans is less than *sufficient* but there is *sufficient evidence of carcinogenicity* in experimental animals and strong evidence in exposed humans that the agent acts through a relevant mechanism of carcinogenicity."

Group 2A, those substances determined to be "probably" carcinogenic to humans, is described as follows: "This category is used when there is *limited evidence of carcinogenicity* in humans and *sufficient evidence of carcinogenicity* in experimental animals. In some cases, an agent may be classified in this category when there is *inadequate evidence of carcinogenicity* in humans and *sufficient evidence of carcinogenicity* in experimental animals and strong evidence that the carcinogenesis is mediated by a mechanism that also operates in humans. Exceptionally, an agent may be classified in this category solely on the basis of *limited evidence of carcinogenicity* in humans. An agent may be assigned to this category if it clearly belongs, based on mechanistic considerations, to a class of agents for which one or more members have been classified in Group 1 or Group 2A."

Group 2B, those substances "possibly" carcinogenic to humans, is described as follows: "This category is used for agents for which there is *limited evidence of carcinogenicity* in humans and less than *sufficient evidence of carcinogenicity* in experimental animals. It may also be used when there is *inadequate evidence of carcinogenicity* in humans but there is *sufficient evidence of carcinogenicity* in experimental animals. In some

instances, an agent for which there is *inadequate evidence of carcinogenicity* in humans and less than *sufficient evidence of carcinogenicity* in experimental animals together with supporting evidence from mechanistic and other relevant data may be placed in this group. An agent may be classified in this category solely on the basis of strong evidence from mechanistic and other relevant data."

The term *"limited evidence of carcinogenicity"* is defined in the preamble as follows: "The data suggest a carcinogenic effect but are limited for making a definitive evaluation because, e.g. (a) the evidence of carcinogenicity is restricted to a single experiment; (b) there are unresolved questions regarding the adequacy of the design, conduct or interpretation of the studies; (c) the agent increases the incidence only of benign neoplasms or lesions of uncertain neoplastic potential; or (d) the evidence of carcinogenicity is restricted to studies that demonstrate only promoting activity in a narrow range of tissues or organs." The term *"inadequate evidence of carcinogenicity"* is defined thusly: "The studies cannot be interpreted as showing either the presence or absence of a carcinogenic effect because of major qualitative or quantitative limitations, or no data on cancer in experimental animals are available."

FACTS AND PROCEEDINGS

On February 27, 1987, the Governor published the initial Proposition 65 list of chemicals. The list included 26 known human carcinogens and three known human reproductive toxins. (*Deukmejian, supra*, 212 Cal.App.3d at p. 429.) It did not include any chemicals identified as carcinogens or reproductive toxins in animals. Such chemicals were instead placed on a " 'candidate list' " to be evaluated by a "newly appointed 'state's qualified experts' panel." (*Brown, supra*, 196 Cal.App.4th at p. 242.)

A citizens group sued to force the Governor to include on the list any chemical known to cause cancer or reproductive toxicity in animals, as referred to in Labor Code section 6382, subdivisions (b)(1) and (d). (*Deukmejian, supra*, 212 Cal.App.3d at p. 429.) The trial court agreed with the plaintiffs and issued a preliminary injunction requiring the Governor to publish a new list containing the indicated substances. (*Id.* at p. 430.) On appeal to this court, we affirmed. (*Ibid.*) OEHHA thereafter added to its Proposition 65 list "those chemicals identified by the Labor Code reference method without regard to whether the chemicals had been identified as human or animal carcinogens or reproductive toxins." (*Brown, supra*, 196 Cal.App.4th at p. 244.)

"OEHHA then devoted its resources to revising the Proposition 65 list in accordance with the methods set forth in subdivision (b) of section

25249.8 . . . . (§ 25249.8, subd. (b).)" (*Brown, supra,* 196 Cal.App.4th at p. 244.) It was not until 15 years after Proposition 65 was enacted that OEHHA again revised the Proposition 65 list using the Labor Code method of section 25249.8, subdivision (a). (196 Cal.App.4th at p. 245.) OEHHA thereafter eliminated various chemicals from the list and added new ones based on monographs issued by the IARC. (196 Cal.App.4th at pp. 245–246.)

On June 12, 2009, OEHHA published a notice entitled, "Request for Comments on Chemicals Proposed for Listing by the Labor Code Mechanism." The notice identified both styrene and vinyl acetate for listing. In 1995, the IARC had issued a monograph categorizing vinyl acetate as possibly carcinogenic within Group 2B, based on inadequate evidence of carcinogenicity in humans and limited evidence of carcinogenicity in experimental animals. In 2002, IARC issued a monograph identifying styrene as possibly carcinogenic within Group 2B, based on limited evidence of carcinogenicity in both humans and experimental animals.

SIRC initiated this action in July 2009. SIRC is a Washington, D.C.-based nonprofit corporation engaged in research and public dissemination of information about styrene. Its members are involved in the manufacture or processing of styrene or styrene-based products and encompass approximately 95 percent of the North American styrene industry. In its complaint, SIRC alleged the IARC had identified styrene as a possible human carcinogen based on " 'limited evidence of carcinogenicity in humans' and 'limited evidence of carcinogenicity in experimental animals.' " SIRC sought a declaration both that OEHHA had adopted a new scheme for determining the chemicals to be included on the Proposition 65 list without having first complied with the Administrative Procedure Act (APA) (Gov. Code, §§ 11340–11361) and that styrene is not a known carcinogen and therefore cannot be included on the Proposition 65 list.

SIRC sought a temporary restraining order prohibiting OEHHA from following through with its intent to include styrene on the Proposition 65 list. On August 20, 2009, the trial court granted the order, concluding SIRC is not likely to prevail on its APA claim but is likely to prevail on its claim that styrene may not properly be listed as a known carcinogen.

On August 26, 2009, Celanese was granted leave to file a complaint in intervention seeking declaratory and injunctive relief prohibiting OEHHA from including vinyl acetate on the Proposition 65 list. Celanese is a Delaware corporation engaged in the business of manufacturing industrial chemicals and is the world's leading producer of vinyl acetate. In its complaint, Celanese alleged: "The IARC monograph for vinyl acetate concludes that there is *not* 'sufficient evidence' of animal carcinogenicity,

reflecting only that there was 'limited evidence' of animal carcinogenicity. [Citation.] IARC further concluded that there was 'inadequate evidence' of human carcinogenicity. [Citation.] Vinyl acetate thus is not a 'known' human or animal carcinogen for the purposes of Proposition 65."

OEHHA filed answers to both complaints, admitting both styrene and vinyl acetate fall within IARC Group 2B and are proposed for listing solely on the basis of Labor Code section 6382, subdivision (d).

The parties thereafter filed cross-motions for judgment on the pleadings.

On December 17, 2009, the trial court entered orders granting in part and denying in part each of the motions. The court concluded OEHHA did not violate the APA by virtue of its methodology for selecting chemicals to include on the Proposition 65 list. However, the court also concluded styrene and vinyl acetate are not known carcinogens and therefore are not properly included on the list. The court entered judgments for SIRC and Celanese.

DISCUSSION

I

*Introduction*

Plaintiffs in the present matter raised two issues in the trial court: (1) whether the listing of styrene was pursuant to an underground regulation, in violation of the APA, and (2) whether Proposition 65 authorized the listing of styrene and vinyl acetate. The trial court ruled for OEHHA on the APA issue, and plaintiffs do not challenge that ruling on appeal. Thus, the sole issue on appeal is whether OEHHA could properly include styrene and vinyl acetate on its Proposition 65 list.

Both sides contend the present matter is controlled by our decision in *Deukmejian.* OEHHA argues *Deukmejian* "expressly held that the Proposition 65 list must include those 'carcinogens within the scope of the HCS,' and that *'the HCS defines as a "carcinogen" all substances* listed by IARC in categories 1 and 2.' " And because styrene and vinyl acetate fall within IARC Group 2B, they must be listed. According to OEHHA, "[i]n affirming the trial court's order, this Court required the State to list all of the IARC 2B chemicals, *including those with less than adequate evidence in animals,* chemicals that are identical to styrene and vinyl acetate in level of evidence and classification." OEHHA points out that if styrene and vinyl acetate had been identified by the IARC as Group 2B substances at the time of our decision in *Deukmejian,* our opinion would have required that they be listed.

Celanese argues in opposition that, in *Deukmejian*, we concluded Proposition 65 permits the listing of chemicals only if they are *known*, and not merely suspected, of causing cancer, regardless of the listing mechanism used by OEHHA. According to Celanese, *Deukmejian* held "that only those Group 2 chemicals as to which there is sufficient evidence that exposure causes cancer or reproductive toxicity should be listed." SIRC likewise argues *Deukmejian* concluded only chemicals for which there is sufficient evidence of cancer causation may be listed.

Obviously, both sides cannot be correct. As a matter of fact, neither is, as we shall explain.

## II

### *Deukmejian*

In *Deukmejian*, the plaintiffs' complaint sought to force the Governor to include on the Proposition 65 list "not only known *human* but also known *animal* carcinogens and reproductive toxins referred to in Labor Code section 6382, subdivisions (b)(1) and (d)." (*Deukmejian, supra*, 212 Cal.App.3d at p. 429.) The trial court issued a preliminary injunction requiring the Governor "to publish a list of substances that includes, at minimum, the known human *and animal* carcinogens identified by reference in Labor Code section 6382, subdivisions (b)(1) and (d)." (*Id.* at p. 430.) It is this preliminary injunction from which the Governor appealed.

We affirmed the trial court's order, concluding "the language of section 25249.8 clearly requires both known human and known animal carcinogens and reproductive toxins identified by reference in Labor Code section 6382, subdivisions (b)(1) and (d) to be included on the initial list." (*Deukmejian, supra*, 212 Cal.App.3d at p. 433.) We explained: "Although [Proposition 65] clearly was intended to protect people and not household pets or livestock, the suggestion that only known human carcinogens are subject to [Proposition 65] ignores the plain language of section 25249.8, subdivision (a), which mandates the initial list include, 'at a minimum,' those chemicals identified by reference in Labor Code section 6382, subdivision (b)(1) and subdivision (d). Subdivision (b)(1) refers expressly both to human and animal carcinogens and subdivision (d) incorporates the HCS which includes known animal carcinogens." (*Deukmejian*, at p. 435.)

Although we concluded in *Deukmejian* that both human and animal carcinogens must be included on the Proposition 65 list, we cautioned that the standard remains *known* carcinogens. Thus, while substances within IARC Group 1 clearly must be listed, "[b]eyond that, the question is not whether a

chemical is 'probably' carcinogenic to humans, but whether it is in fact a known carcinogen or reproductive toxin. IARC Group 2 and supplemental category chemicals *as to which there is sufficient evidence that exposure causes cancer or reproductive toxicity in animals* are also known carcinogens." (*Deukmejian, supra,* 212 Cal.App.3d at p. 437, italics added.)

OEHHA argues the net result of our decision in *Deukmejian* was to require the Governor to include all IARC Group 2B chemicals on the Proposition 65 list. However, this must be placed in context. In *Deukmejian,* we pointed out that the IARC Group 1 chemicals are those for which there is sufficient evidence of a causal connection between exposure and cancer in humans. (*Deukmejian, supra,* 212 Cal.App.3d at p. 434.) We also noted the IARC Group 2 chemicals include those "for which there is 'sufficient evidence' of carcinogenicity in animals." (*Ibid.*) Of these, Group 2A was usually reserved for those "for which there was at least *limited evidence* of carcinogenicity to humans," whereas Group 2B included those for which there was sufficient evidence of carcinogenicity in animals but inadequate evidence for humans. (*Ibid.*) In a footnote, we explained that while the IARC does not use the term "known carcinogen," the parties agreed, "for the purpose of interpreting the IARC monographs, 'sufficient evidence' of carcinogenicity is the equivalent of 'known' carcinogenicity." (*Id.* at p. 434, fn. 3.) Finally, we explained the Governor's "initial list selected from the HCS those substances that HCS deems are *known* to cause cancer or reproductive toxicity in humans," and the trial court's order merely required the Governor "to add to that list the substances that HCS deems are also *known* to cause cancer or reproductive toxicity in animals." (*Id.* at p. 438, italics added.)

Thus, our decision in *Deukmejian* was premised on an understanding that, for chemicals included in Group 2B, there was sufficient evidence of carcinogenicity in animals. (*Deukmejian, supra,* 212 Cal.App.3d at p. 434.) But, as explained earlier, that is not in fact necessarily the case. Group 2B includes substances for which "there is *limited evidence of carcinogenicity* in humans and less than *sufficient evidence of carcinogenicity* in experimental animals."

■ Of course, the only issue presented in *Deukmejian* was whether the Proposition 65 list must include both human and animal carcinogens, and we answered that question in the affirmative. We were not asked to consider the question presented here, i.e., whether substances identified by reference in an IARC monograph for which there is not sufficient evidence of carcinogenicity in either humans or animals must be included on the list. Cases are not authority for propositions not considered therein. (*In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388 [53 Cal.Rptr.2d 81, 916 P.2d 476].) Nevertheless, as we explain in the next section, we find the reasoning in *Deukmejian* persuasive as to the proper interpretation of section 25249.8.

## III

### *Listing of IARC Group 2B Chemicals*

As explained earlier, Health and Safety Code section 25249.8, subdivision (a), requires that the Proposition 65 list include, at a minimum, those substances identified by reference in Labor Code section 6382, subdivisions (b)(1) or (d). Labor Code section 6382, subdivision (d), identifies as a hazardous substance any substance within the scope of the HCS. The HCS, in turn, identifies as a source for establishing that a chemical is "a carcinogen or potential carcinogen," the IARC monographs. (29 C.F.R. § 1910.1200(d)(4) (2012).) Read literally, the foregoing provisions would require that the Proposition 65 list include any substance identified as a carcinogen "or potential carcinogen" in an IARC monograph. However, as we shall explain, a literal interpretation of those provisions would be inconsistent with the voters' intent underlying Proposition 65.

██ The question presented in this appeal is essentially one of statutory construction, which we consider de novo. (*Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724 [122 Cal.Rptr.3d 331, 248 P.3d 1185].) " 'In interpreting a voter initiative . . . , we apply the same principles that govern statutory construction.' " (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 900 [135 Cal.Rptr.2d 30, 69 P.3d 951].) "We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.] To determine legislative intent, we turn first to the words of the statute, giving them their usual and ordinary meaning. [Citations.] When the language of a statute is clear, we need go no further. However, when the language is susceptible of more than one reasonable interpretation, we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 340 [14 Cal.Rptr.3d 857, 92 P.3d 350].)

Section 25249.8, subdivision (a), requires the publication of a list of chemicals "known to the state to cause cancer or reproductive toxicity within the meaning of this chapter." (§ 25249.8, subd. (a).) It then goes on to mandate that the list include, at a minimum, substances identified by reference in Labor Code section 6382, subdivision (d), which in turn identifies substances within the HCS.

██ SIRC argues the foregoing statutory scheme permits OEHHA to include on the *initial* Proposition 65 list those chemicals identified in the HCS, but not any chemicals added to the HCS thereafter. According to SIRC,

the reference to Labor Code section 6382, subdivision (d), which in turn refers to the HCS, must be interpreted to mean the versions existing at the time of enactment of Proposition 65. At that time, styrene was not included in the HCS. In *Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, at pages 58 to 59 [195 P.2d 1], the state high court indicated: "[W]here a statute adopts by specific reference the provisions of another statute, regulation, or ordinance, such provisions are incorporated in the form in which they exist at the time of the reference and not as subsequently modified . . . ."

■ In *Brown*, the Court of Appeal rejected the argument SIRC raises here. (*Brown, supra,* 196 Cal.App.4th at pp. 257–258.) The court explained that what is incorporated by Health and Safety Code section 25249.8, subdivision (a), is Labor Code section 6382, subdivisions (b)(1) and (d), i.e., the specific language of those provisions. That language has not changed since the adoption of Proposition 65. Nor has the relevant language of the HCS changed, only the lists referred to therein. (196 Cal.App.4th at p. 257.) Furthermore, section 25249.8, subdivision (a), expressly contemplates changes to the relevant list, by requiring that it be updated at least annually. (196 Cal.App.4th at p. 258.) We agree with *Brown* that the Labor Code method of populating the Proposition 65 list is not frozen in time but may be updated as the lists identified by the HCS are updated.

OEHHA argues the foregoing statutory language must be read to mean any chemical that meets the criteria set forth in section 25249.8 is, *by definition*, "known to the state to cause cancer or reproductive toxicity within the meaning of this chapter." Thus, according to OEHHA, we must look to the remainder of the provision, and in particular the minimum requirements identified by reference in Labor Code section 6382, to determine the breadth of the listing requirement.

Assuming, as OEHHA argues, the phrase "known to cause cancer within the meaning of this chapter" means the same thing as being identified by reference in Labor Code section 6382, this leads us nowhere. Labor Code section 6382 identifies by reference chemicals within the scope of the HCS. The HCS is concerned with "hazardous chemicals" (29 C.F.R. § 1910.1200(b)(1) (2012)), which "include more than 'chemicals known to the state to cause cancer or reproductive toxicity.' " (*Brown, supra,* 196 Cal.App.4th at p. 241.)

■ A literal reading of the foregoing provisions would lead to a requirement that the Proposition 65 list include substances other than carcinogens or reproductive toxins, a result clearly at odds with the language of section 25249.8 read as a whole. Not even OEHHA proposes such a broad interpretation. We must therefore look beyond the bare language of section 25249.8,

subdivision (a), to ascertain legislative intent. " ' "The mere literal construction of a section in a statute ought not to prevail if it is opposed to the intention of the legislature apparent by the statute; and if the words are sufficiently flexible to admit of some other construction it is to be adopted to effectuate that intention. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." ' " (*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].)

 In *Deukmejian*, we observed: "It is true that 'any substance within the scope of the federal [HCS]' (§ 6382, subd. (d)) includes chemicals other than known carcinogens. Section 25249.8, subdivision (a) and [Proposition 65] itself, however, are concerned only with those substances that authoritative bodies have concluded are known to cause cancer or reproductive toxicity. Thus, the initial list, and subsequent lists published thereafter, need not include all substances listed under HCS but only known carcinogens and reproductive toxins listed there." (*Deukmejian, supra*, 212 Cal.App.3d at p. 438.)

"The purposes of Proposition 65 are stated in the preamble to the statute, section 1, which declares in pertinent part: 'The people of California find that hazardous chemicals pose a serious potential threat to their health and well-being, that state government agencies have failed to provide them with adequate protection, and that these failures have been serious enough to lead to investigations by federal agencies of the administration of California's toxic protection programs. The people therefore declare their rights: [¶] (a) to protect themselves and the water they drink against chemicals *that cause* cancer, birth defects, or other reproductive harm.' (Ballot Pamp., Proposed Stats. with arguments to voters, Gen. Elec. (Nov. 4, 1986) p. 53 (hereafter Ballot Pamphlet) [(italics added)].)

 "Further evidence of [Proposition 65]'s purpose and intent can be gleaned from the ballot materials. '[W]hen . . . the enactment follows voter approval, the ballot summary and arguments and analysis presented to the electorate in connection with a particular measure may be helpful in determining the probable meaning of uncertain language.' " (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 306 [58 Cal.Rptr.2d 855, 926 P.2d 1042].)

The "Argument in Favor of Proposition 65" from the Ballot Pamphlet states in part: "There are certain chemicals that are scientifically known—not merely suspected, but known—to cause cancer and birth defects. Proposition 65 would: [¶] . . . [¶] Warn us before we're exposed to any of these dangerous chemicals. . . ." (Ballot Pamp., Gen. Elec. (Nov. 4, 1986) argument

in favor of Prop. 65, p. 54.) It further states: "Proposition 65 singles out chemicals that are scientifically known to cause cancer or reproductive disorders . . . ." (*Ibid.*) Finally, the Ballot Pamphlet advised: "Proposition 65's new civil offenses focus only on chemicals that are *known to the state* to cause cancer or reproductive disorders. Chemicals that are only suspect are not included. . . ." (*Ibid.*)

OEHHA argues an interpretation of Proposition 65 that limits it to substances that are known to cause cancer or reproductive toxicity would be inconsistent with the interpretation of the Occupational Safety and Health Administration (OSHA), the agency charged with interpreting the HCS, and with OEHHA's own administrative interpretation. "An agency interpretation of the meaning and legal effect of a statute is entitled to consideration and respect by the courts; however, unlike quasi-legislative regulations adopted by an agency to which the Legislature has confided the power to 'make law,' and which, if authorized by the enabling legislation, bind this and other courts as firmly as statutes themselves, the binding power of an agency's *interpretation* of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

OEHHA argues guidance and enforcement documents issued by OSHA regarding the HCS make clear that all Group 1, 2A and 2B chemicals are to be considered carcinogens under the HCS. However, this is not surprising since, as noted earlier, the HCS expressly states that manufacturers, importers and employers must treat various sources, including IARC monographs, "as establishing that a chemical is a carcinogen *or potential carcinogen* for hazard communication purposes." (29 C.F.R. 1910.1200(d)(4) (2012), italics added.) Thus, the HCS, by its very terms, is not concerned solely with chemicals that are known to cause cancer and OSHA's interpretation of the HCS to this effect really adds nothing.

As for OEHHA's interpretation of Proposition 65, this too is entitled to little or no deference. As described earlier, for 15 years after enactment of Proposition 65, OEHHA did not even utilize the Labor Code method for listing chemicals solely based on their inclusion in an IARC monograph. This has been OEHHA's practice only during the last 10 years or so. "[A]n agency's vacillating practice—i.e., adopting a new interpretation that contradicts a prior interpretation—is entitled to little or no weight." (*Brown, supra*, 196 Cal.App.4th at p. 254.) And OEHHA has not adopted any formal regulations to this effect. "[W]hen, as here, the agency does not have a long-standing interpretation of the statute and has not adopted a formal regulation interpreting the statute, the courts may simply disregard the

opinion offered by the agency." (*State of California ex rel. Nee v. Unumprovident Corp.* (2006) 140 Cal.App.4th 442, 451 [44 Cal.Rptr.3d 491]; see *Interinsurance Exchange of the Automobile Club v. Superior Court* (2007) 148 Cal.App.4th 1218, 1236 [56 Cal.Rptr.3d 421].)

Furthermore, an administrative agency "does not have the authority to 'alter or amend' a statute, or 'enlarge or impair its scope.' " (*State of California ex rel. Nee v. Unumprovident Corp., supra,* 140 Cal.App.4th at p. 451.) Ultimately, any question regarding the proper interpretation of a statute is an exercise of judicial power for the courts. (*Bodinson Mfg. Co. v. California E. Com.* (1941) 17 Cal.2d 321, 326 [109 P.2d 935]; *Interinsurance Exchange of the Automobile Club v. Superior Court, supra,* 148 Cal.App.4th at p. 1236.) This is especially so where, as here, the agency in question has no particular interpretive advantage over the courts based on some expertise. (*Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at p. 12.) While OEHHA may have an interpretive advantage over the courts in determining whether a particular chemical causes cancer, it does not have such advantage in determining whether the appropriate standard under the statute is one of known cause or possible cause.[2]

In *Deukmejian,* we repeatedly cautioned that the Governor's listing obligation under Proposition 65 is limited to substances which are *known* to cause cancer.

In *Western Crop Protection Assn. v. Davis* (2000) 80 Cal.App.4th 741 [95 Cal.Rptr.2d 631] (*Western Crop*), the plaintiff sought a writ of mandate prohibiting OEHHA from including on the Proposition 65 list certain chemicals that had been identified by the federal Environmental Protection Agency (EPA) for inclusion on the federal Toxics Release Inventory (TRI) on a finding that they either cause or "can be reasonably anticipated to cause" reproductive toxicity. (80 Cal.App.4th at p. 746.) We affirmed the trial court's denial of writ relief. We first determined that, on the record before us, we could not ascertain whether the standard applied by the EPA was broader than that applicable to Proposition 65. (80 Cal.App.4th at pp. 748–749.) We then went on to assess whether, assuming the EPA standard is broader, OEHHA could nevertheless determine on a chemical-by-chemical basis whether the criteria used by the EPA satisfied the Proposition 65 standard.

---

[2] SIRC has requested that we take judicial notice of various documents allegedly relevant to the question of OEHHA's interpretation of Proposition 65 over the years. However, in light of our conclusion that OEHHA's interpretation is entitled to little weight based on information otherwise available to us, we need not consider these additional materials. SIRC's request is therefore denied. OEHHA has requested judicial notice of various documents to counter those proposed for judicial notice by SIRC. However, because we deny SIRC's request, we likewise deny that of OEHHA.

We explained: "It is conceded the chemicals from the TRI list that have been placed on the California list are there because of EPA's findings they cause or can reasonably be anticipated to cause reproductive toxicity in humans. If it can be objectively ascertained that the reason the EPA placed a particular chemical on the TRI list is because it found sufficient evidence of reproductive toxicity to qualify under the California definition, that suffices to meet the criteria of the California law." (*Western Crop, supra,* 80 Cal.App.4th at p. 752.) We thereafter concluded: ". . . OEHHA has the authority to examine the administrative record of the TRI procedure to determine if there is substantial evidence that the EPA has placed a chemical on the EPA list because it meets the state's criteria of 'causing . . . reproductive toxicity.' If so, from all that is made to appear on this record, the federal criteria of 'sufficient for listing' are also met. Accordingly, the fact that the federal standard may be broad enough to allow inclusion of chemicals on the TRI that do not satisfy the California standard does not prevent OEHHA from determining that a chemical was placed on the TRI by EPA 'as . . . causing reproductive toxicity.' " (*Id.* at p. 754.)

In other words, as long as there is sufficient evidence that the EPA placed a particular chemical on the TRI list based on criteria sufficient to satisfy Proposition 65's requirement that the chemical be *known* to cause reproductive toxicity, it does not matter that the federal standard may otherwise be broader and that other chemicals may have been placed on the TRI list based on a lesser showing.

■ Our analysis in *Western Crop,* like that in *Deukmejian,* was based on a recognition that chemicals may be included on the Proposition 65 list only if there is a sufficient showing that they in fact cause cancer or reproductive toxicity. This interpretation is consistent with the legislative history underlying Proposition 65 and does not conflict with the minimum requirements language of section 25249.8, subdivision (a).

■ We conclude the Proposition 65 list is limited to chemicals for which it has been determined, either by OEHHA through one of the methods described in Health and Safety Code section 25249.8, subdivision (b), or through the Labor Code method of adopting findings from authoritative sources, that the chemical is known to cause cancer or reproductive toxicity. Because the findings in the IARC monograph on which OEHHA relies to list styrene and vinyl acetate do not satisfy that standard, they cannot properly be included on the list on that basis alone. And because OEHHA does not propose any other basis for including those substances on the list, they must be excluded. Thus, the trial court properly granted judgment on the pleadings for plaintiffs on that issue.

## DISPOSITION

The judgments are affirmed.

Blease, Acting P. J., and Butz, J., concurred.

On November 15, 2012, the opinion was modified to read as printed above.